## Rhodes v. Chas. W. Young & Co.

*William K. Rhodes*, for plaintiff.
*Lindenmuth & Class*, for defendant.

BRETHERICK, J., June 8, 1950.—We have before us defendant's rule to show cause why judgment entered pursuant to a warrant of attorney contained in a bond should not be opened. Because of the necessity for a prompt decision in the matter, we entered an order dated June 2nd opening the judgment as to all sums in excess of $432.90, and stated that an opinion would follow.

The testimony taken on defendant's rule discloses a novel and somewhat confusing situation. We think the case can best be viewed as embodying two distinct transactions and then a partial merging of these transactions.

At all times herein material, defendant, Charles W. Young & Co. (hereinafter called the corporation), was a corporation engaged in the manufacture of soap. Charles W. Young was president of the corporation, and Grace B. Young was vice president and treasurer. Charles W. Young and Grace B. Young were husband and wife.

Grace B. Young also conducted a business of her own under the trade name, "U. S. Soap". This latter entity

was a selling agency, and handled a large part of the corporation's output.

In December 1948 Grace B. Young, trading as U. S. Soap, became indebted in the sum of $12,500 to the Philadelphia National Bank (hereinafter called Philadelphia). Evidently there had been many earlier transactions between Mrs. Young and Philadelphia, but these prior dealings are of no materiality to the present issue. By writing dated December 13, 1948, plaintiff, Samuel N. Rhodes, became surety to the extent of $5,000 on the $12,500 loan from Philadelphia to Mrs. Young. The writing provided that for every dollar the loan was reduced, plaintiff's suretyship obligation was reduced 50 cents, with the result that plaintiff's liability ceased when the loan fell to $2,500.

Charles W. Young delivered to plaintiff, as security, the titles to certain motor vehicles owned by the corporation. In a letter of transmittal dated December 14, 1948, written on the corporation's stationery and signed by Charles W. Young (individually and not as president), it was stated:

"We hand you herewith Titles (to the motor vehicle) on which you are going to have recorded encumbrance to cover your guarantee to The Philadelphia National Bank in the amount of Two Thousand Dollars, and which we have this day agreed to settle by March fifteenth 1949. These encumbrances are to be settled and Titles returned to us when the Philadelphia National Bank account is paid off to the amount of your guarantee as arranged with the Bank today."

There was also delivered to plaintiff as part of this transaction a chattel mortgage covering these same motor vehicles, and the corporation's bond and warrant for $25,000, which was subsequently entered of record.

Turning to the second transaction, it appears that in the summer of 1948 Mr. and Mrs. Young were in-

debted to plaintiff in the sum of $10,000. In order to finance the corporation in the manufacture of soap, plaintiff arranged to have the First National Bank of Media (hereafter called Media) extend credit to Charles W. Young to the extent of $15,000. Plaintiff "guaranteed" this credit, and delivered a paid-up policy of life insurance to Media as collateral security. (We are not advised as to the exact form of plaintiff's "guarantee" to Media, nor whether it was oral or in writing). To secure himself from loss, plaintiff took from Mr. and Mrs. Young a judgment note for $25,000, which was subsequently entered of record and became a lien on their residence property, held by the entireties, and situated in this county.

Thereafter, Media made loans to Charles W. Young, the proceeds of which were used to finance the corporation in the manufacture of soap. The testimony is not altogether clear as to the precise form of these loans, and the point is not particularly material. Plaintiff says in his able brief that Charles W. Young would take the invoice for a shipment of soap, manufactured by the corporation, to Media, which would take Charles W. Young's note for the amount of the invoice and pay him 90 percent thereof. In any event, it is agreed that the remaining 10 percent went into an escrow account at Media. It is also agreed that one third of this 10 percent was to be paid to plaintiff as a fee or commission for the loan of his credit. The other two thirds of the 10 percent was to build up a fund which might eventually pay off the entire loan account.

We now come to the point where these entirely separate transactions merge to some extent. On March 15, 1949, Philadelphia made demand on plaintiff and Mr. and Mrs. Young for the payment of $1,298.70 on account of Mrs. Young's indebtedness to Philadelphia. Plaintiff met with Mr. Young, and they agreed that the $1,298.70 be withdrawn from the escrow account at

Media. The balance in the account at that time (before withdrawal) was $3,098.42, and the account was in plaintiff's name *alone*. Plaintiff had at no time made any withdrawals from the account of his fees or commissions.

Accordingly, plaintiff and Mr. Young both *signed* a check withdrawing $1,298.70 from the escrow account, the check was given to Media in exchange for its draft or cashier's check, the latter was sent to Philadelphia, and Philadelphia credited the amount of $1,298.70 to Mrs. Young's loan account, on which plaintiff was surety as shown heretofore. It should be said here that it is this transaction which constitutes the core and substance of the present controversy.

Charles W. Young defaulted on the Media loans and plaintiff was compelled to make good on his guaranty. The balance in the Media escrow account (including plaintiff's undivided one-third share) was applied on account of Young's indebtedness, and on November 15, 1949, plaintiff paid the additional sum of $13,461.22 to Media out of his own funds. Obviously, the $1,298.70 which had been withdrawn from the Media escrow account to pay Philadelphia on account of Mrs. Young's indebtedness, was not available as a set-off, and the amount plaintiff was required to pay to Media was correspondingly greater.

Eventually plaintiff entered judgment against Mr. and Mrs. Young on the $25,000 note given him both as security for his guaranty and for the Youngs' prior $10,000 indebtedness. The damage assessed included the $13,461.22 which plaintiff had paid to Media. Execution issued, and, thereupon Mr. and Mrs. Young availed themselves of what is called in the testimony "a modified form of bankruptcy".

It remains to be said that by March 2, 1950, Mrs. Young had reduced her indebtedness to Philadelphia

to $2,070.87, whereupon plaintiff's liability as surety in the first transaction ceased.

Early in April 1950 plaintiff entered the within judgment against defendant on its bonds accompanying the chattel mortgage given to secure plaintiff's guaranty of the Philadelphia loan. Execution issued, the motor vehicles covered by the mortgage were levied upon, and defendant obtained the present rule to open, with a stay of proceedings meanwhile.

It is plaintiff's theory that in paying Media $1,298.70 more than he would have had to pay if that sum had not been withdrawn from the escrow account and paid to Philadelphia, he was in reality paying part of Mrs. Young's loan to Philadelphia; and that, therefore, defendant is liable to him in that sum. Defendant, on the other hand, maintains that plaintiff paid nothing to Philadelphia, and, consequently, is entitled to recover nothing from defendant.

We are of opinion that, as so often happens, the truth lies somewhere between these extremes. It is true, of course, that when the $1,298.70 was withdrawn from the escrow account and paid to Philadelphia, it could no longer be used as a set-off on Mr. Young's indebtedness to Media, and plaintiff was required to pay Media just that much more to make good on his guaranty. But it does not follow that plaintiff *thereby* paid any part of Mrs. Young's Philadelphia loan. To the contrary, when plaintiff paid Media $13,461.22, he was paying Mr. Young's indebtedness to Media and no one else's. The truth of that assertion is proved by the fact that plaintiff included that amount in his judgment against Mr. and Mrs. Young, his indemnitors in the Media transaction.

In our opinion, the decision in this case turns on the answer to the question of the real ownership of the funds in the escrow account. At the hearing it was orally stipulated between counsel that two thirds of

the escrow account "was to be used to build up a fund" in order to repay Charles W. Young's entire indebtedness; and that "the other one third of the 10 percent was to go to Mr. Sam Rhodes as profits, if any." Defendant raises the question as to *when* plaintiff became the owner of the one third, and calls attention to the fact that no appropriation or allocation of the fund was ever made. It is clear to us that the one third "was to go" to plaintiff at the same time that the two thirds "was to go" to build up the reserve fund, i. e., immediately upon a deposit in the escrow account. In consequence, plaintiff was at all times the owner of one third of the balance in the escrow account. Just as clearly Charles W. Young was the owner of the remaining two thirds, although he was obligated by his agreement with plaintiff to keep the money in the account as an additional security.

The balance in the escrow account was $3,098.42 immediately before the $1,298.70 was withdrawn. Of that balance, plaintiff was indubitably the owner of $1,032.80. The remainder belonged to Charles W. Young, subject to the agreement just mentioned. However, the ownership was undivided, and it is neither logical nor just to say that plaintiff was the owner of $1,032.80 out of the $1,298.70 withdrawn and paid to Philadelphia. On the other hand, plaintiff was, in conscience and in equity, the owner of one third of $1,-298.70 or $432.90. Charles W. Young was the owner of the remaining $865.80, and plaintiff must be deemed to have consented to its withdrawal, thereby lessening his security.

It follows that plaintiff is entitled to recover $432.90 in this section, and the judgment was properly opened as to all sums in excess of that amount.

We cannot assent to plaintiff's proposal that the "corporate entity should be disregarded and the transaction treated as the debt of Charles W. Young and

Grace B. Young and the pledged vehicles as their property". There are situations where a court may, and should, disregard the corporate entity and consider the corporation and the aggregate of individuals comprising it as identical: Pearl Assurance Company, Ltd., v. National Insurance Agency, Inc., 151 Pa. Superior Ct. 146. This is not one of those situations. The uncontradicted testimony established that in November 1949 Charles W. Young's mother was the owner of 30 percent of the stock of the corporation. The remaining 70 percent was owned by Mr. and Mrs. Young. To regard the pledged vehicles as the property of Mr. and Mrs. Young, assuming we could regard the debt as theirs, would inevitably result in prejudice and hardship to an innocent third party. Moreover, in view of the supervening bankruptcy proceedings involving Mr. and Mrs. Young, our power so to act would be exceedingly problematical.

One additional matter requires brief mention. After the close of the testimony on April 28, 1950, counsel entered into a stipulation whereby it was agreed that:

"Samuel N. Rhodes would testify that at the time he and Charles W. Young transferred funds from the First National Bank of Media to the Philadelphia National Bank in the amount of $1,298.70 Charles W. Young agreed orally that the Chattel Mortgage would remain as security for the said sum of $1,298.70 so paid. . . ."

Aside from the question of Charles W. Young's authority to pledge the corporation's property for the purpose indicated, it must be borne in mind that the bond and warrant was given to plaintiff as security only in the *Philadelphia transaction*. The stipulation does not state that plaintiff would testify that Young agreed that the *bond and warrant* "would remain as security for the said sum of $1,298.70 so paid." In the absence of such an agreement, there would, of course,

be no right in plaintiff to use the bond for a purpose other than that for which it was given.

It was for the reason herein set forth that we entered the order of June 2, 1950, "that defendant's rule to open judgment be, and the same is, made absolute as to all sums in excess of $432.90".